IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

ST. LUKE'S HOSPITAL, d/b/a
MCLAREN ST. LUKE'S
c/o Martin Morrissey
5901 Monclova Road
Maumee, OH 43537

And

WELLCARE PHYSICIANS GROUP, LLC
c/o Jennifer Montgomery
5901 Monclova Road
Maumee, OH 43537

       Plaintiffs,

vs.

PROMEDICA HEALTH SYSTEM, INC.
c/o CT Corporation System
4400 Easton Commons Way, Ste. 125
Columbus, OH 43219

and

PROMEDICA INSURANCE
CORPORATION
c/o CT Corporation System
4400 Easton Commons Way, Ste. 125
Columbus, OH 43219

and

PARAMOUNT CARE, INC.
c/o CT Corporation System
4400 Easton Commons Way, Ste. 125
Columbus, OH 43219

and

PARAMOUNT CARE OF MICHIGAN,
INC.
c/o The Corporation Company

CASE NO.

Judge

**COMPLAINT WITH JURY TRIAL
DEMANDED**

36652014.25

40600 Ann Arbor Rd, E. Ste 201
Plymouth, MI 48170

and

PARAMOUNT INSURANCE COMPANY
c/o CT Corporation System
4400 Easton Commons Way, Ste. 125
Columbus, OH 43219

and

PARAMOUNT PREFERRED OPTIONS,
INC.
c/o CT Corporation System
4400 Easton Commons Way, Ste. 125
Columbus, OH 43219

      Defendants.

## **COMPLAINT**

## **INTRODUCTION**

1.      This Complaint is being filed to seek preliminary and permanent injunctive relief and damages in response to immediately impending actions by ProMedica Health System, Inc. ("ProMedica") which threaten to seriously harm St. Luke's Hospital and its physicians and patients. ProMedica's actions will further cement and enhance ProMedica's dominant market position and will suppress efforts at greater competition by St. Luke's.

2.      McLaren Health Care Corporation, a multi-hospital system in Michigan, has recently acquired St. Luke's, and agreed to revitalize it with a $100 million investment, as well as the assumption of substantial debt. McLaren's commitment will provide vital support to allow St. Luke's to recover from the serious financial wounds inflicted on it by the unfair divestiture agreement imposed on St. Luke's by ProMedica, after ProMedica's acquisition of St. Luke's was reversed by the Federal Trade Commission ("FTC"). McLaren's efforts will also include additional

2

critical assistance which will allow St. Luke's to operate successfully and offer a broader range of services to the community. These new services would include substantial new cancer care services offered by the Karmanos Cancer Center, a subsidiary of McLaren which provides nationally recognized cancer services, including a wide variety of services not now available in Lucas County. These efforts will make St. Luke's a more significant competitor to ProMedica, the dominant health care system in Lucas County.

3.      In response, ProMedica has caused its health insurance subsidiaries ("Paramount") to provide notice of termination of their commercial insurance and Medicare Advantage contracts with St. Luke's and its physicians, effective January 1, 2021. Notice of termination was given the day after the McLaren acquisition was complete. In fact, senior ProMedica executives admitted that this action was taken in response to McLaren's acquisition and in response to the prospect of greater competition from McLaren St. Luke's. On the same date, ProMedica terminated the contracts of its Michigan hospitals with McLaren Health Plan.

4.      ProMedica also caused its subsidiaries to terminate eight different service and related contracts with St. Luke's after the McLaren transaction was announced. ProMedica also applied pressure to its physicians to cease practicing at St. Luke's.

5.      All these actions will harm (and some already have harmed) St. Luke's and health care competition in numerous relevant markets in Lucas County. In particular, termination of the Paramount contracts would very seriously and irreparably injure St. Luke's, would deprive large numbers of patients of their preferred health care providers, and would suppress additional competition from St. Luke's which the McLaren relationship promises to create. These actions are completely anticompetitive, unjustified, and contrary to the legitimate business interest of Paramount, since it has been highly profitable for Paramount to include St. Luke's in its network,

and Paramount has done so since 2010. Similarly, the physician relationships that ProMedica has terminated have been highly beneficial to ProMedica, and have existed since 2018. ProMedica and Paramount's actions make sense only as an effort to harm St. Luke's and maintain ProMedica's dominance.

6.      These actions triggered by the McLaren transaction are only the latest in an ongoing campaign by ProMedica to prevent or suppress competition from St. Luke's and its other competitors and to thereby maintain and enhance ProMedica's monopoly power. ProMedica's actions began in 2007 and 2008, when it demanded that certain major health plans not include St. Luke's in their networks. ProMedica's anticompetitive actions continued with an effort to acquire St. Luke's, even though it should have been apparent to ProMedica that such an acquisition clearly violated federal antitrust laws. ProMedica then removed many of St. Luke's functions and services while the FTC's antitrust challenge was proceeding. ProMedica continued to take action to harm St. Luke's throughout the "divestiture" process ordered by the FTC.

7.      ProMedica's efforts to harm St. Luke's and diminish its competitiveness also resulted in the imposition of extremely harsh terms as part of the divestiture, which left St. Luke's saddled with enormous debt and tremendous obstacles to operating profitably after the divestiture.

8.      During the same period, ProMedica has taken extraordinary steps to neutralize any competition from University of Toledo Medical Center ("UTMC"). ProMedica agreed to pay University of Toledo hundreds of millions of dollars in order to shift virtually the entire faculty of the University of Toledo Medical School from UTMC to ProMedica, thereby depriving UTMC of its status as an academic medical center and conferring that status on ProMedica Toledo Hospital.

9.      All these actions have been taken for one reason and one reason only, and that is to harm competition and entrench ProMedica's dominance. They are clear violations of the antitrust

4

laws. In particular, unless the attempted termination of St. Luke's by Paramount is preliminarily and permanently enjoined, ProMedica's efforts will be successful, and St. Luke's, its patients and health care in Lucas County will be irreparably harmed.

## PARTIES

10.     Plaintiff St. Luke's Hospital, d/b/a "McLaren St. Luke's" is a domestic nonprofit corporation organized under the laws of Ohio. Its principal office is located in the City of Maumee Ohio, County of Lucas, and State of Ohio. The sole member of St. Luke's Hospital is McLaren Health Care Corporation.

11.     Plaintiff WellCare Physicians Group, LLC ("WellCare"), is a domestic limited liability company organized under the laws of Ohio. WellCare employs physicians and other medical practitioners in a variety of specialties. Its principal office is located in the City of Maumee Ohio, County of Lucas, and State of Ohio. The sole member of WellCare is St. Luke's.

12.     Defendant ProMedica Health System, Inc. ("ProMedica") is a domestic nonprofit corporation organized under the laws of Ohio. Its principal office location is located in Toledo, Lucas County, Ohio. ProMedica offers medical, surgical, psychiatric, rehabilitative, skilled nursing, home health, and hospice services across 28 states. The system includes at least 12 hospitals, 4 ambulatory surgery centers, and more than 400 post-acute facilities. The system also includes a large employed physician group and insurance entities, as described below.

13.     Defendant ProMedica Insurance Corporation is a domestic nonprofit corporation organized under the laws of Ohio. The principal office location of ProMedica Insurance Corporation is located in Toledo, Lucas County, Ohio. ProMedica is the sole shareholder of ProMedica Insurance Corporation. ProMedica Insurance Corporation and its subsidiaries currently offer various insurance products in Ohio and Michigan, including commercial insurance, Medicaid, Medicare, and managed care workers compensation insurance.

5

14.     Defendant Paramount Care, Inc. ("Paramount") is a domestic nonprofit corporation organized under the laws of Ohio. The principal office of Paramount Care, Inc. is located in Maumee, Lucas County, Ohio. ProMedica Insurance Corporation is the sole shareholder of Paramount Care, Inc.

15.     Paramount Care of Michigan, Inc. ("Paramount of Michigan") is a nonprofit corporation organized under the laws of Michigan. The principal office of Paramount Care of Michigan, Inc. is located in Dundee, Monroe County, Michigan. ProMedica Insurance Corporation is the sole shareholder of Paramount Care of Michigan, Inc.

16.     Paramount Insurance Company ("Paramount Insurance Company") is a for profit corporation organized under the laws of Ohio. The principal office of Paramount Insurance Company is located in Maumee, Lucas County, Ohio. ProMedica Insurance Corporation is the sole shareholder of Paramount Insurance Company.

17.     Paramount Preferred Options, Inc. ("Paramount Preferred Options") is a for profit corporation organized under the laws of Ohio. The principal office of Paramount Preferred Options, Inc. is located in Maumee, Lucas County, Ohio. ProMedica Insurance Corporation is the sole shareholder of Paramount Preferred Options, Inc. ProMedica Insurance Corporation and the various ProMedica entities are referred herein collectively as "Paramount."

**JURISDICTION AND VENUE**

18.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26 and Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

19.     Defendants transact business in the Northern District of Ohio and are subject to personal jurisdiction therein. The actions complained of herein took place in this district. Venue is proper in this district pursuant to 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391.

6

## **TRADE AND COMMERCE**

20.     Defendants are engaged in interstate commerce and their activities substantially affect interstate commerce. Hundreds of millions of dollars of ProMedica's revenues come from sources located outside of Ohio, including payments from the federal government through such programs as Medicare, and payments from out of state commercial payors such as Aetna, Cigna and United. Paramount receives millions of dollars of payments in interstate commerce from Medicare and from the federal government to subsidize payments for Paramount members on the health care exchanges. Paramount also receives millions of dollars in payments of premiums from employers outside of Ohio who have Paramount members inside Ohio. ProMedica owns and operates medical facilities and an insurance company, Defendant Paramount of Michigan, in Michigan. ProMedica treats a substantial number of patients from other states, including, in particular, Michigan. The Defendants expend millions of dollars on the purchase of supplies in interstate commerce.

21.     St. Luke's also earns millions of dollars (and WellCare earns at least hundreds of thousands of dollars) of revenues in interstate commerce. These include at least hundreds of thousands of dollars of payments in interstate commerce relating to Paramount members outside of Ohio, treating patients from outside Ohio, and treating patients whose employers are based outside of Ohio. St. Luke's and WellCare obtain millions of dollars in payments from national insurers, such as Aetna and United, as well as Medicare. This is also true in particular for the obstetrics, outpatient CT surgery and ENT surgery services provided by St. Luke's and which were affected by ProMedica's anticompetitive conduct. St. Luke's also purchases millions of dollars in goods (and WellCare purchases at least hundreds of thousands of dollars and goods) across state lines.

7

22.    For these reasons, the threatened increase in volume and market power of ProMedica, the shifting of Paramount members from St. Luke's and the weakening of St. Luke's described herein will substantially affect the parties' revenues in interstate commerce. Such actions will also substantially affect the flow of patients across state lines and purchase of supplies in interstate commerce, substantially increasing ProMedica's volume of patients and interstate purchases and decreasing the volumes of St. Luke's Hospital and WellCare Physicians' patients and interstate purchases. The increase in ProMedica's prices that will result from these actions will also substantially impact patients and health plans purchasing ProMedica's services, or previously purchasing St. Luke's services, in interstate commerce.

23.    With the exceptions of these activities in interstate commerce, ProMedica, Paramount, St. Luke's and WellCare all engage in substantial activities (involving hundreds of millions of dollars) in intrastate commerce in Ohio. The ProMedica facilities, St. Luke's and WellCare all provide their services primarily to patients in Ohio. These activities involve hundreds of millions of dollars of services for each of these parties. Paramount sells insurance primarily to employers and members in Ohio. All these entities employ significant numbers of individuals in Ohio. As a result, the anticompetitive actions challenged herein will also have (and have had) a substantial impact on intrastate commerce in Ohio, because they will substantially affect the revenues and purchases of each of the parties hereto.

## MONOPOLY POWER

24.    ProMedica has monopoly power in each of the relevant markets. ProMedica has a share of at least 45%-50% in the relevant general acute care hospital markets, as described below. It has a 70% share in the relevant inpatient OB services markets. It has greater than a 50% share in the relevant cardiothoracic surgery, overall outpatient surgery and ENT outpatient surgery markets. It has a 40%-50% share in the relevant emergency department and imaging markets.

8

25.     The evidence of ProMedica's market power is set forth in great detail by the findings in the rulings relating to ProMedica's acquisition of St. Luke's. This includes the rulings by the Federal Trade Commission, *In the Matter of ProMedica Health System, Inc.*, 2012-1 Trade Cases P 77840 (F.T.C.) (2012), 2012 WL 1155392 ("FTC Commission Decision"), its Administrative Law Judge, *In the Matter of ProMedica Health System, Inc.*, 152 F.T.C. 708 (2011), 2011 WL 11798464 ("ALJ Decision"), Judge Katz of this Court, *F.T.C. v. ProMedica Health System, Inc.*, No. 3:11 CV 47, 2011 WL 1219281 (N.D. Ohio Mar. 29, 2011) ("Judge Katz Decision") and the Sixth Circuit's opinion affirming the Federal Trade Commission's opinion, *ProMedica Health System, Inc. v. F.T.C.*, 749 F.3d 559 (6th Cir. 2014) ("Sixth Cir. Decision"). While all those decisions were based on events in the 2010 period, ProMedica's market position has become significantly stronger since that time. ProMedica has added new facilities since the time period addressed by these decisions, including its ProMedica Wildwood Orthopedic and Spine Hospital and its Parkway Surgery Center. It has also, as described more fully below, effectively acquired the greater part of the medical staff of University of Toledo Medical Center, and severely weakened that competitor. ProMedica's actions described below have also weakened competition from St. Luke's. Both, St. Luke's and UTMC have lost at least two market share points since 2015, and ProMedica has gained market share commensurately.  For all these reasons, ProMedica is even more dominant today than it was in 2010 and 2011.

26.     The evidence from these decisions shows that ProMedica is a "must-have" system for health plans seeking to serve companies with employees in Lucas County, because health plans cannot offer a commercially viable provider network to those companies without including ProMedica. The Federal Trade Commission found that "the record makes clear that a network which does not include a hospital provider that services half the county's patients in one relevant

9

market, and more than 70% of the county's patients in another relevant market, would be unattractive to a huge swath of potential members." Sixth Cir. Decision at 570. Under the prevailing two stage model of health care competition, as described below and in the Sixth Circuit's decision, if a hospital is needed by health care plans in order for them to offer a provider network which will allow them to attract employers and individuals to subscribe to their plans, then that hospital is able to demand higher prices and thereby possesses monopoly power.

27.     The evidence of ProMedica's market dominance is overwhelming. Judge Katz noted in his opinion that "ProMedica acknowledged its market dominance in the Lucas County market through ordinary course documents," Judge Katz Decision *20, citing five different ProMedica documents. Judge Katz also noted that "ProMedica's pre-Acquisition [of St. Luke's] dominance was evident in its ability to successfully negotiate St. Luke's exclusion from [a managed care] network for 16 months." Judge Katz Decision at *20. Judge Katz also noted that "[l]ocal employers and physicians recognize that ProMedica is the dominant healthcare provider in Lucas County." Judge Katz Decision at *27.

28.     The Federal Trade Commission reached the same conclusion. In the Commission's opinion concerning ProMedica's acquisition of St. Luke's, it noted that "ProMedica regards itself as the dominant hospital system in Lucas County, and that assessment is shared by others." FTC Commission Decision at *8. The Administrative Law Judge in the FTC proceeding noted that a "Standard & Poor's credit presentation stated: 'ProMedica Health System has market dominance in the Toledo MSA.'" ALJ Decision at *60. The Administrative Law Judge noted that "ProMedica listed its '[d]ominant market share' as a strength" in an internal analysis. ALJ Decision at *60.

29.     This dominance exists, in part, because ProMedica does not have any rivals who are capable of restraining it. Judge Katz noted that "Mercy did not provide a sufficiently strong

10

competitive constraint to prevent ProMedica from exercising its market power before the Acquisition." Judge Katz Decision at *24. Judge Katz also noted that "[p]rior to the Acquisition, Mercy's presence in the market did not limit ProMedica's ability to charge the highest rates, by far, in Lucas County." Judge Katz Decision at *24. Judge Katz concluded that "Mercy has not been a sufficiently strong competitive constraint before the Acquisition against ProMedica's exercise of market power." Judge Katz Decision at *23.

30.     The leading Mercy hospital, St. Vincent, offers outstanding services, but because of its location in the central city of Toledo and its large volume of poor and indigent patients, it is not as attractive a location for more affluent commercially insured patients as is the ProMedica-owned Toledo Hospital. This limits Mercy's ability to compete with ProMedica.

31.     The other competitor in Lucas County, UTMC, has recently been substantially weakened by the actions of ProMedica, including the payment of hundreds of millions of dollars in order to secure the movement of UTMC's residents and most of its medical staff to ProMedica's Toledo Hospital. As a result, UTMC is not a significant competitive constraint on ProMedica's ability to raise prices.

32.     As also described below, St. Luke's has already been significantly weakened by ProMedica's actions, and is operating currently with huge financial losses. With the acquisition by McLaren, St. Luke's is positioned to become a more significant competitive constraint on ProMedica, but ProMedica's actions as described in this Complaint are being undertaken in order to prevent that from happening.

33.     Since 2010, the time period analyzed by the FTC and the courts, ProMedica's market share has increased while the market shares of St. Luke's and UTMC have decreased.

36652014.25

34.     ProMedica's monopoly power is also reflected in its ability to charge unusually high prices. Judge Katz also noted that ProMedica, prior to its acquisition of St. Luke's, had "the highest prices in Lucas County." Judge Katz Decision at *20. The Federal Trade Commission concluded that "ProMedica, as the dominant hospital system in Lucas County, had significant bargaining leverage which allowed it to command among the highest rates, not only in Lucas County, but also the entire state of Ohio." FTC Commission Decision at *50. These high prices do not reflect a higher quality of services. The Federal Trade Commission concluded that while ProMedica was "among the most expensive hospital systems in Ohio . . . at the same time, however, some of its quality scores are 'subpar.'" FTC Commission Decision at *24. Judge Katz concluded that "ProMedica, the system with the highest market shares, has the highest prices." Judge Katz Decision at *20. Judge Katz's opinion, the opinion of the FTC Administrative Law Judge and the opinion of the Federal Trade Commission all concluded that "in this market, the higher a provider's market share, the higher its prices . . . ProMedica's prices – already among the highest in the state – are explained by *bargaining power*." Sixth Cir. Decision at 570. (Emphasis in original.)

## PROMEDICA'S ANTICOMPETITIVE ACTIONS

### ProMedica's Actions Taken to Harm St. Luke's Prior to Its Effort to Acquire St. Luke's

35.     ProMedica has sought to harm St. Luke's and suppress its competition since at least 2008. The FTC's Administrative Law Judge noted that a St. Luke's competitor assessment prior to the acquisition of St. Luke's by ProMedica observed that ProMedica "will continue to starve SLH through exclusive managed care contracts and owned physicians. They will do this until we sign up with them or are weakened." Judge Katz Decision at *15. The Administrative Law Judge also referred to another St. Luke's document which noted that ProMedica is "continuing an aggressive strategy to take over St. Luke's or put us out of business." Judge Katz Decision at *15.

12

The Administrative Law Judge found that St. Luke's was concerned that if it partnered with other facilities it would receive a "scorched earth response" from ProMedica. Lee Hammerling, ProMedica's Chief Medical Officer and a Vice President, informed St. Luke's leadership that "we'll take you apart piece by piece" if St. Luke's didn't agree to a ProMedica acquisition. Dr. Hammerling's comment referred to hiring St. Luke's physicians and pulling ProMedica physicians from the St. Luke's campus.

**ProMedica's Efforts to Harm St. Luke's in Connection with the Divestiture of St. Luke's**

36.     ProMedica's efforts to suppress competition from St. Luke's and to maintain and increase its monopoly power continued with its efforts to acquire St. Luke's. As Judge Katz found, "ProMedica and St. Luke's entered into their transaction with full knowledge of the applicable antitrust laws and a recognition that the Acquisition raised serious antitrust issues." Judge Katz Decision at *50. Nevertheless, ProMedica went forward with the transaction.

37.     During the period that the merger case was litigated with the FTC, ProMedica took a number of steps which seriously disadvantaged St. Luke's if it was to be divested. ProMedica rapidly moved to integrate St. Luke's operations with ProMedica as soon as possible, even though it knew that these efforts might have to be unwound in the future to the detriment of St. Luke's. The acquisition was completed in May of 2010 and the FTC began investigating the transaction very shortly thereafter. Nevertheless, ProMedica moved to rapidly integrate the "back office" operations at St. Luke's, including most of the functions necessary to the running of a hospital, including billing, purchasing, supply chain, IT, finance, and marketing. The "integration" of these functions involved removing these functions from St. Luke's, and often transferring St. Luke's employees in these areas to ProMedica. St. Luke's lost almost 200 employees through this process. St. Luke's ultimately had to restore those functions, and replace these employees "from scratch" after divestiture.

13

38.     ProMedica also, contrary to its "hold separate" agreement with the FTC, removed a number of clinical and clinically related services from St. Luke's. This included a number of laboratory functions (including microbiology and histology), and the replacement of a "biplane" special procedures x-ray unit with a "single plane" unit. The single plane unit is unable to perform many high end procedures which are critical to treating stroke victims. This limited the ability of St. Luke's to treat stroke victims, and this equipment had to be replaced after the divestiture.

39.     ProMedica also determined that a newly established "step down" intensive care unit, which required less intense staffing than the overcrowded full intensive care unit would not be built to include in-wall "medical gases." This is a critical problem, because it requires that oxygen be supplied in an awkward way through tanks brought into the room, and also makes it more difficult to utilize ventilators and perform other procedures that require compressed air. All these steps had the effect of reducing St. Luke's ability to treat more seriously ill patients and making it less competitive with ProMedica, contrary to the hold separate agreement. All these actions weakened St. Luke's competitiveness after the divestiture was complete.

40.     ProMedica also took a number of steps to weaken medical education at St. Luke's. In connection with ProMedica's affiliation with University of Toledo Medical School, it ended the emergency physician residency and radiologist residency programs at St. Luke's. ProMedica also allowed St. Luke's family medicine residency program to lapse during a dispute with the U.S. Center for Medicare and Medicaid Services, even though the dispute was ultimately resolved successfully by St. Luke's two years later. In the interim, St. Luke's had no family medicine residents. Residency programs are very important to a hospital, because they provide additional staff, and also train physicians who may stay at the hospital after their residency is complete, providing long term growth in the hospital's medical staff. ProMedica's actions harmed St. Luke's

14

ability to maintain and grow its medical staff. During this period, the quality of St. Luke's services declined, though they improved again after divestiture.

41.    After the Federal Trade Commission's decision ordering divestiture of St. Luke's, it was necessarily apparent to ProMedica that divestiture would need to occur, since the likelihood of success on appeal given the deferential legal standard and the substantial basis for the Federal Trade Commission's opinion, was remote. Nevertheless, ProMedica determined to pursue the appeal until the end. In the interim period, it made no efforts to set the stage for St. Luke's to begin to operate again on its own. Moreover, it failed to sufficiently invest in St. Luke's to adequately maintain its operations. For example, it never made any effort to market St. Luke's in the community. Indeed, patients who called into St. Luke's would be referred to ProMedica's call center, which generally referred them to other hospitals and physicians in the ProMedica system rather than St. Luke's or Wellcare, even if the ProMedica physicians' offices were less convenient to the patient. As a result of these actions, St. Luke's market position, its operations and its finances deteriorated.

42.    ProMedica also recruited a number of physicians away from Wellcare, inducing them to work at ProMedica, including two of St. Luke's most productive physicians as well as two very busy nurse practitioners. At the same time, ProMedica made no efforts to recruit new doctors into Wellcare, even though every hospital's success depended on its medical staff.

43.    ProMedica thus used its (temporary) ownership position to severely weaken St. Luke's while it was apparent that divestiture of St. Luke's was very likely. ProMedica's actions made no sense unless it expected St. Luke's to be divested and intended to use the period before divestiture to weaken St. Luke's.

44.     After ProMedica lost the case to the FTC, it began the divestiture process. During the divestiture period, ProMedica's neglect of St. Luke's operations continued, even though it still owned the hospital until the divestiture process was complete and even though the FTC's order required that ProMedica "take such actions as are necessary to maintain the viability, marketability and competitiveness" (FTC Commission Decision at *56) of St. Luke's, and to "[u]se best efforts to maintain and increase revenues" (FTC Commission Decision at *57) at St. Luke's.

45.     ProMedica's neglect is illustrated by its decision to scrap the planned installation of a new telephone system at St. Luke's after ProMedica's chief technology officer outlined this as an "urgent need," with an estimated cost of $3.85 million. In fact, the first phase of the hardware replacement was actually shipped to St. Luke's, but then, at ProMedica's direction, was returned with a note saying "this decision is being prolonged due to divestiture of SLH." ProMedica also continued to fail to recruit new physicians for Wellcare. St. Luke's requested that its employees receive retention bonuses to encourage them not to leave St. Luke's during this period of uncertainty, but (with one exception) ProMedica refused to do so. ProMedica also refused to allow its executives to go to work at St. Luke's, relying on noncompete provisions in their agreements.

46.     After initial discussions with St. Luke's about a divestiture that would allow St. Luke's to begin to operate on its own, ProMedica shifted course and attempted to sell St. Luke's to a third party operator of health care systems, Capella Health. ProMedica undertook this approach because it believed that Capella Health would operate St. Luke's on a "shoe string," and would either fail in its efforts to operate St. Luke's or would maintain it as a marginal hospital that would not provide any competitive challenge to ProMedica.

47.     Capella Health has operated hospital systems around the United States. But at the time that ProMedica engaged these discussions with Capella Health, at least 11 hospitals that had

16

been purchased by Capella Health in the prior 10 years were subsequently resold. Four of them ceased providing inpatient services shortly after being sold. Capella Health had reported significant losses at numerous times prior to its discussion with ProMedica, was highly leveraged with debt, and had an extremely weak balance sheet.

48.     Capella's plan, consistent with its method of operating its hospitals, virtually guaranteed that ownership by Capella would cause St. Luke's to be a weak and uncompetitive hospital. Capella's approach was to purchase hospitals, financed by very large indebtedness, and earn back the sums needed to service the indebtedness by leasing the hospital back to an operating entity at 9% interest. As a result, Capella's hospitals were burdened by enormous debt, and therefore couldn't afford to expand operations or invest in capital.

49.     Capella's statements to St. Luke's personnel indicated that its plan was to operate St. Luke's at a "bare bones" level. For example, Capella's CEO, Michael Wiechart, said that there was no reason why St. Luke's would need to perform open heart surgeries, spinal surgery or orthopedics, and that if it did not perform these procedures, it would get along better with ProMedica. Wiechart added that Capella's approach was to maintain "cordial relationships" with its competitors, and that he believed in "service rationalization" in communities in which Capella operated. It was clear that Capella's aim was to make St. Luke's into a minor hospital that would not compete with ProMedica and would refer its high end cases to ProMedica, just as ProMedica had envisioned from the merger.

50.     At the time of its discussions with ProMedica, Capella Health had been recently purchased by Medical Properties Trust ("MPT"). MPT was a company engaged in real estate transactions, often involving hospitals. Its role in owning hospitals was to obtain returns on the hospital real estate rather than to operate the hospitals in a manner that maximized their success as

36652014.25

health care institutions. For example, MPT said in a 2015 earnings call that "our business model has always been to use our hospital operating knowledge to obtain not just real estate returns but in *certain circumstances* operating returns as well." (Emphasis added.) Thus, Capella was primarily a company that owned hospitals for the value of their real estate. It could not possibly be expected to revitalize St. Luke's as a significant hospital which could compete with ProMedica.

51.     St. Luke's protested the plan to sell the hospital to Capella as one which would create a great risk of hospital failure and would guarantee that the hospital would not provide a high level of care. St. Luke's also protested to the FTC regarding ProMedica's plan. In response, ProMedica told St. Luke's that it would agree not to sell to Capella, but only if St. Luke's agreed to its terms for a divestiture transaction on a "take it or leave it" basis.

52.     Because of the steady deterioration of St. Luke's due to ProMedica's neglect and outright interference with St. Luke's operations, St. Luke's leadership realized that it was critical to complete divestiture as soon as possible in order to enable the hospital to begin more successful operations. Additionally, the divestiture process was taking much longer than required by the FTC, and St. Luke's was very concerned that if it did not quickly work out the terms of divestiture with ProMedica, that ProMedica would propose another third party purchaser to the FTC and the FTC could approve that purchaser in order to complete the acquisition expeditiously. Additionally, St. Luke's steadily lost employees during this period because of the uncertainty regarding the resolution of the divestiture process. As a result, St. Luke's leadership was very concerned about allowing the negotiations with ProMedica to drag on, since this would cause further harm to St. Luke's. For this reason, St. Luke's was forced to agree to ProMedica's "take it or leave it" terms, rather than risk further lengthy negotiations in a situation in which St. Luke's had very little leverage.

36652014.25

53.     The "take it or leave it" terms offered by ProMedica included, among other things, a requirement that the Paramount-St. Luke's contracts be amended to provide that Paramount could terminate them immediately if there were any change in control in the operation of St. Luke's. ProMedica's executives specifically stated that this provision was designed to keep St. Luke's from gaining a stronger partner that would make it more competitive. This provision, like other provisions in the divestiture agreement described herein, was agreed to by St. Luke's only as a result of ProMedica's coercion.

54.     The change in control provision was thus intended to deter other entities which might help St. Luke's to be more effective and competitive from affiliating with it, or, if that deterrence failed, to retaliate against such an affiliation and damage St. Luke's ability to compete. ProMedica has now carried out the purpose of the change in control provision in its recent notice of termination to St. Luke's. Therefore, the impact of the change in control provision will be felt by St. Luke's on January 1, 2021, unless it is enjoined.

55.     The change in control provision effectively conditioned continued contracts with Paramount on St. Luke's willingness to not affiliate with another partner and therefore to continue to operate in a weakened fashion. That provision, being carried out for the first time by ProMedica and Paramount today, was clearly anticompetitive and had no legitimate purpose.

56.     ProMedica consistently took an unreasonable stand in these negotiations. Randy Oostra, ProMedica's CEO, stated regarding St. Luke's that it was "our hospital." He said that ProMedica "get[s] to decide what to do with it." ProMedica demanded that it deal directly with St. Luke's business people, and tried to keep St. Luke's attorneys out of the negotiation process.

57.     ProMedica also demanded as part of the divestiture that St. Luke's reimburse it for funds that had been spent to improve St. Luke's during the period in which ProMedica owned St.

Luke's, even though ProMedica had made few if any efforts to adequately maintain St. Luke's operations. Additionally, ProMedica, while ostensibly charging St. Luke's costs for transition services to allow St. Luke's to transition to operating as an independent hospital, assessed those costs at high, unsustainable levels.

58.     At the end of the divestiture process, St. Luke's faced the need to completely restore back office functions and adopt new IT systems in a short eighteen month period. St. Luke's was also required under the parties' divestiture agreement at ProMedica's insistence to pay ProMedica $35 million for investments made by ProMedica in the hospital.

59.     As a result of these steps, St. Luke's came out of the divestiture process as a hospital with a significant eight figure annual loss and with a weakened balance sheet. Since the divestiture, St. Luke's has provided improved quality of care, but it has been unable to undertake the initiatives necessary to restore itself as a significant competitor in the market, and has needed a partner in order to allow it to do so.

60.     After divestiture was completed, ProMedica was still obligated to provide transition services to St. Luke's to assist it in beginning to operate on its own. However, ProMedica neglected these efforts, and in many ways failed to provide the services as required. For example, St. Luke's received millions of dollars in uncollectable account balances because ProMedica failed to issue bills for months to years for these accounts, and often failed to obtain pre-authorization from health plans or conduct adequate follow-up in order to justify payment. In many cases, the requirements for timely filing for payment were exceeded.

61.     Since the divestiture, and before the McLaren acquisition, ProMedica executives have told their employees that St. Luke's would "get burned" and not survive more than three years.

36652014.25

**ProMedica's Actions to Suppress Competition from UTMC**

62.     ProMedica's scheme to suppress competition by its hospital competitors included its 2015 affiliation with the University of Toledo and actions taken pursuant to that affiliation.

63.     Until recently, the University of Toledo Medical School physicians were the only physicians on the medical staff of University of Toledo Medical Center. As a result, the hospital referrals of those physicians were critical to the continued viability of UTMC.

64.     In 2015, ProMedica entered into a scheme to control the University of Toledo Medical School faculty, and thereby to control UTMC. University of Toledo and ProMedica entered into an affiliation agreement which made ProMedica the exclusive clinical affiliate for University of Toledo medical education. Since the faculty engaged in medical education are the same physicians who served as the medical staff at UTMC, this gave ProMedica control of the UTMC medical staff.

65.     The affiliation agreement accomplished this in a wide variety of ways. It set up a joint board, 50% of whose members were from ProMedica, which was given control over (among other things) faculty recruitment, "resource allocation" with respect to faculty members, approval of academic programs, determination of a strategic plan for the medical school and its faculty and the identity of the chairs of each department of the medical school (who were required to be identical to the service line chairs at ProMedica). This effectively gave ProMedica veto power over the University of Toledo Medical School's actions.

66.     Even more significantly, ProMedica and University of Toledo agreed to a plan whereby all medical school residents would be shifted from UTMC to ProMedica's Toledo Hospital and its children's hospital. The plan was to make Toledo Hospital an academic medical center. The effect of this plan was to eliminate UTMC's role as an academic medical center

21

providing "high end," sophisticated hospital care, which has been central to its ability to compete in the Lucas County market.

67.     Pursuant to that plan, ProMedica and University of Toledo agreed to move all or virtually all University of Toledo faculty physicians from UTMC to ProMedica. As carried out, all faculty members except for those in orthopedics, family medicine and psychiatry were required to move their practices to Toledo Hospital.

68.     While an affiliation between ProMedica and University of Toledo could have benefited medical education, an exclusive affiliation that gave ProMedica effective control of the University of Toledo Medical School, diverted critical resources from UTMC and therefore significantly diminished UTMC's competitive abilities was both highly anticompetitive and unnecessary to provide benefit to medical education.

69.     ProMedica paid University of Toledo enormous sums of money in order to gain this control. According to ProMedica's securities disclosures in documents related to its bond offering, the agreement provided for transition payments from $17 million to $47 million per year up to 2020, with payments after that of at least $50 million per year. Additionally, ProMedica agreed to spend $250 million to construct and renovate University of Toledo Medical College. According to University of Toledo's bond disclosures, University of Toledo received a total of more than $100 million from ProMedica pursuant to this agreement through its 2020 fiscal year. According to a memo by Randy Oostra, CEO of ProMedica, ProMedica had made more than $130 million in payments under the affiliation agreement as of June of this year.

70.     These enormous expenditures were made possibly only by the financial resources possessed by ProMedica by the virtue of its monopoly power. Thus, they reflect ProMedica's

ability to use its power to exclude competition. The expenditures made no sense except as a device to suppress competition from UTMC and gain ProMedica additional market power.

71.     These payments make clear that what was termed an affiliation agreement was intended to be effectively a purchase of UTMC. The amount agreed to be paid is more than what would normally be paid for a hospital of UTMC's size on the open market. ProMedica clearly intended by these payments to accomplish the transfer of all of UTMC's most significant assets to ProMedica. This was intended by ProMedica to result in elimination of UTMC as, at the very least, an effective competitor, and, ideally, from ProMedica's point of view, as a viable hospital.

72.     Many of ProMedica's goals have already been accomplished. Large numbers of University of Toledo Medical School physicians have transitioned their practices over to ProMedica, and no longer practice at UTMC. 260 ProMedica physicians have received academic appointments at the University of Toledo Medical School. All residents in the graduate medical education program at University of Toledo Medical School now receive their education at ProMedica. ProMedica thus has accomplished much of its goal of becoming an academic medical center, and depriving UTMC of its resources as an academic medical center.

73.     In response to these actions, UTMC suffered very significantly. At one point, it suffered a $20 million loss. It was forced to make substantial layoffs.

74.     More recently, UTMC has gained back some ground, primarily through an affiliation with the Toledo Clinic, an independent practice many of whose physicians now are on the medical staff at UTMC. Nevertheless, ProMedica has succeeded in suppressing the ability of UTMC to compete with ProMedica as an academic medical center. Moreover, these efforts show ProMedica's continuing plan to suppress all competition in the Lucas County hospital market by whatever means possible.

36652014.25

75.     ProMedica's plan was to manage UTMC after it had weakened it, similar to what it had attempted to accomplish several years before with regard to St. Luke's. However, an uproar in the community, followed by investigations by state legislators, the Ohio Attorney General's office and Federal Trade Commission, has delayed any such efforts.

### McLaren's Agreement to Acquire St. Luke's

76.     Because of the unfair actions directed at St. Luke's by ProMedica during the divestiture process, St. Luke's was substantially in debt after the divestiture. It suffered losses of more than $38 million in 2018. St. Luke's realized that it needed to affiliate with another partner in order to continue to be viable.

77.     In 2019, McLaren and St. Luke's announced that they had signed a letter of intent to acquire St. Luke's. A definitive agreement was ultimately signed in 2020, and the acquisition was completed on October 1, 2020.

78.     Pursuant to this agreement, McLaren Health Care Corporation has become the sole member of St. Luke's. McLaren publicly agreed to commit to at least $100 million in a capital investment in St. Luke's. Additionally, McLaren agreed to assume $65 million of St. Luke's debt and $55 million of St. Luke's pension liability. Absent McLaren's acquisition, St. Luke's would not be able to pay its existing debt and would likely cease as a going concern.

79.     McLaren is a large health care corporation operating hospitals throughout Michigan. McLaren has been in several successful "turnarounds" of troubled hospitals. It was widely recognized that the McLaren affiliation had the potential to revitalize St. Luke's and permit it to become a more effective competitor.

### ProMedica's Actions After the McLaren Acquisition was Announced
### Termination of Services Contracts

80.     In response to the impending acquisition of St. Luke's by McLaren, on June 1, 2020, ProMedica terminated or refused to renew eight different contracts with St. Luke's on behalf of its subsidiaries Heartland of Perrysburg OH, LLC, HCRMC-ProMedica JV, LLC, ProMedica Central Physicians, ProMedica Northwest Ohio Cardiology Consultants, and ProMedica Toledo Hospital. One of these contracts, involving the provision of cardiothoracic surgeons to work at St. Luke's, had operated successfully since 2010. The other seven contracts had operated successfully for three to four years. All of these contracts were profitable to ProMedica, and there were no disputes or concerns raised with regard to any of them prior to the terminations.

81.     While the notice of termination of these contracts did not identify a reason for these actions, they occurred only five days after it was announced that a McLaren executive would be the interim CEO at St. Luke's Hospital.

82.     The loss of cardiothoracic surgeons has caused substantial and continuing damage to St. Luke's. These surgeons (primarily one surgeon, Christopher Riordan) had performed all the cardiothoracic surgery at St. Luke's. The ProMedica surgeons have since been replaced, but the primary new cardiothoracic surgeon (who is relocating from Michigan) has had no prior relationships with cardiologists or other physicians who refer heart surgery cases to a cardiothoracic surgeon. As a result, the number of heart surgeries performed at St. Luke's has recently declined by more than 70%. This has caused St. Luke's substantial damages.

83.     The ProMedica cardiothoracic surgeon, Dr. Riordan, desired to continue practicing at St. Luke's, and opposed the action by ProMedica. Moreover, that was the preference of the cardiac service line group at ProMedica. But leadership at ProMedica ordered that the agreement be terminated. Dr. Riordan informed a St. Luke's executive that this action was a response to the McLaren transaction.

25

84.     One of the other terminated contracts related to the use of a ProMedica physicist to assist radiologists at St. Luke's. A physicist performs an essential role in every hospital radiology department in monitoring and managing its radiographic equipment. The ProMedica-employed physicist who served St. Luke's was not even aware that the contract had been terminated until he was informed of this fact by St. Luke's personnel. He was very disturbed at the result, and did not wish to quit working at St. Luke's. He told St. Luke's that his view was shared by his direct superior, the Radiology Director at ProMedica Toledo Hospital. The physicist and his superior protested the decision, but were informed by ProMedica leadership that the physicist was no longer allowed to stay and work at St. Luke's.

85.     Other ProMedica physicians practicing at St. Luke's have informed St. Luke's personnel that they have felt pressure from ProMedica leadership to cease doing cases at St. Luke's. As a result, the ENT surgeons employed by ProMedica who had practiced at St. Luke's for many years have ceased performing surgeries there, even though they maintain an office on the St. Luke's campus. This has resulted in a dramatic decline in ENT surgery at St. Luke's and has caused significant injury to St. Luke's.

**<u>Notice of Termination of Paramount Contracts</u>**

86.     On October 2, 2020, one day after the McLaren transaction became effective, Paramount sent notice to St. Luke's regarding the termination of the commercial and Medicare Advantage contracts between St. Luke's, WellCare and Paramount. That notice was sent by hand delivery, certified mail and email.

87.     The notice stated that Paramount was "exercising its right to terminate" because "Paramount is aware that [St. Luke's] has joined McLaren Health Care . . . effective October 1, 2020." Therefore, Paramount expressly stated that it was taking this action because of the

acquisition by McLaren. It was taken pursuant to the "change in control" provision added to the contracts at ProMedica's demand during the divestiture process.

88.     ProMedica's rationale was further explained on an October 19, 2020, call with Kathy Kendall of McLaren and Jennifer Montgomery, the CEO of St. Luke's, Steve Cavanaugh, the ProMedica Health System CFO, and Lori Johnston, the CEO of Paramount. Mr. Cavanaugh made clear that ProMedica directed Paramount to send a notice of termination to St. Luke's because St. Luke's has been acquired by McLaren, and will therefore be a more formidable competitor for ProMedica. The notice of termination was therefore sent to suppress such competition and harm St. Luke's ability to compete.

89.     Mr. Cavanaugh, who is not an executive of Paramount, took the lead on the call. He said that the notice of termination was being sent because McLaren Health Care Corporation is a large competitor to ProMedica with over $5 billion annually in revenues. Mr. Cavanaugh added that McLaren was adding a cancer program to St. Luke's, using (the renowned) Karmanos Cancer Center, and that would directly compete with ProMedica. Thus, Mr. Cavanaugh directly linked the Paramount terminations to the prospect of greater competition from McLaren St. Luke's.

90.     ProMedica has acknowledged in writing that the Notice of Termination was sent because of McLaren's strength and its involvement in St. Luke's. A document entitled "Talking Points and Q&A for ProMedica Employee Health Plan Members," circulated within ProMedica included the statement that "McLaren Health, a large out of state health system based near Flint, Mich., took ownership of St. Luke's Hospital on October 1, 2020. This led Paramount to share its intent to end its contracts, effective January 1, 2021." A memo to "ProMedica Leadership," from Lori Johnston, ProMedica repeated the same statement.

**The Planned Termination Has No Legitimate Business Purpose, and Is Exclusionary**

27

91.     The Paramount contracts that ProMedica seeks to terminate are longstanding and have been very beneficial to Paramount and ProMedica, and the planned terminations will be substantially unprofitable to Paramount and ProMedica, but for its anticompetitive effects. Paramount had contracted with St. Luke's since 2010, and had contracted with St. Luke's subsidiary WellCare Physicians, LLC since 2008, two years prior to the acquisition of St. Luke's by ProMedica. These contracts continued after the divestiture of St. Luke's from ProMedica, until the completion of the acquisition of St. Luke's by McLaren. There were no pending disputes or issues with these contracts at the time that the notice of termination was sent.

92.     The FTC's Administrative Law Judge found that "Paramount's President believed that the addition of St. Luke's to Paramount's network made Paramount more attractive to employers in southwestern Lucas County and had a positive impact on Paramount." ALJ Decision at *47. In fact, the City of Maumee, Maumee School System and Anthony Wayne Schools, all major employers in southwest Lucas County near St. Luke's, all chose Paramount for insurance after (and because) St. Luke's was added to its network. These three employers alone represented 14,000 lives. Paramount will now be at risk of losing all of the business previously added as a result of including St. Luke's and WellCare into its network.

93.     As part of the divestiture agreement between ProMedica and St. Luke's, ProMedica voluntarily agreed to continue the relationship between Paramount and St. Luke's for at least three years. In 2018, ProMedica agreed to further extend this relationship until 2023, without any provision for termination without cause. This is indicative that ProMedica thought that the relationship was in fact profitable.

94.     The profitability of the St. Luke's contract with Paramount is reflected in the fact that Paramount has historically also contracted with UTMC. UTMC was important to Paramount's

36652014.25

network because it offered quaternary services, not otherwise available in the network. Similarly, St. Luke's was important to Paramount's network, because St. Luke's Hospital is the only hospital in Maumee, which is an affluent suburban community in Lucas County. Without St. Luke's Hospital in its network, many individuals living in Maumee or elsewhere in southwest Lucas County who wish to use their local (more convenient) hospital would likely wished to choose another health plan. Many of their employers are at risk to change health plans in order to accommodate their employees' wishes. The terminations will also make it more difficult for Paramount to attract new accounts in the growing Maumee area.

95.     Additionally, St. Luke's is the lowest cost and lowest priced hospital in the market by a significant margin. Therefore, it was extremely profitable for Paramount to offer St. Luke's in its network.

96.     Paramount has routinely advertised to its members that St. Luke's is in its network. The "Elite FAQs" for the Paramount Elite Medicare Advantage product, in answering the question "what hospitals are in your network?", lists St. Luke's among only six hospitals listed by name. St. Luke's is second on that list after ProMedica Toledo Hospital, and ahead of the other ProMedica hospitals.

97.     Health plans generally try to include as many hospitals as possible in their networks, because employers choose health plans in significant part based on whether their employees can find their preferred hospital and doctor in a health plan's network. Health plans routinely lose members and fail to obtain employer accounts because they do not have sufficient numbers of providers (including hospitals) in their network. For these reasons, it is extremely rare for a health plan to ever terminate a hospital unless it is unable to agree on rates or other terms with the hospital.

98.     Even hospital-owned health plans generally aim for broad networks of hospitals, because it is in their best interest. For example, McLaren Health Plan ("MHP"), owned by McLaren Health Care Corporation, has about 140 hospitals in its network, including about 30 hospitals that directly compete with McLaren's hospitals. This includes many hospitals in the Detroit area, in Flint (where McLaren began operations), Lansing (where there are only two hospitals), and in northern Michigan. McLaren Health Plan includes these competing hospitals in its network because it is in its best interest to provide a broad network of hospitals to attract more subscribers.

99.     The only exceptions occur where, as in Lucas County, the owner of the health plan intends to maintain its monopoly power and therefore gains a special benefit from limiting its network. A hospital system, like ProMedica, with market power, can gain additional monopoly profits by maintaining and enhancing its power. A hospital in a competitive market would not have anything to gain by restricting the profitability of its health plan, because it would not be able to earn any monopoly profits by harming its competitors. Therefore, ProMedica's actions are directly motivated by its monopoly power and its anticompetitive scheme.

100.    For all these reasons, the notices of termination were completely contrary to Paramount's interests, and quite unprofitable to it. These actions only made sense because they were performed in order to squelch competition from St. Luke's after ProMedica faced the prospect that McLaren St. Luke's would become a more significant competitor. ProMedica would not have directed Paramount to send notice of termination to St. Luke's if it did not possess significant market power and did not have a goal of maintaining and enhancing its power by harming St. Luke's.

**Other Actions Directed at St. Luke's and McLaren**

36652014.25

101.    In response to McLaren's completion of its acquisition of St. Luke's, ProMedica also terminated the contracts of its Michigan hospitals with McLaren Health Plan ("MHP"). MHP had contracts with these hospitals since 2013 and 2014, respectively, and these contracts were continued by ProMedica after it acquired these hospitals. There were no disputes between MHP and ProMedica with regard to rates or other terms at these hospitals. There was no reason to terminate the contracts, and the terminations make no economic sense, except as an effort to send a signal to McLaren that if it competed vigorously in Lucas County with ProMedica, that there would be contribution from ProMedica for those actions.

102.    ProMedica officials confirmed that they took their actions for anticompetitive reasons in a discussion they had with Representative Jason Sheppard of Michigan. Rep. Sheppard inquired as to the reasons why the Paramount contracts with St. Luke's and the contracts between ProMedica's Michigan hospitals and McLaren Health Plan were terminated. ProMedica's executives stated that these actions were taken solely because McLaren is now a competitor of ProMedica. They added that ProMedica would have preferred that St. Luke's remain independent and not be bought out by anyone. The ProMedica executive repeated that they were taking these actions because they were now facing McLaren as a competitor.

103.    In its efforts to suppress competition by St. Luke's, and to attempt to harm and potentially destroy St. Luke's, ProMedica is building a full emergency center literally a few hundred yards from St. Luke's emergency department.

104.    This action makes no sense except as an effort to harm St. Luke's and increase ProMedica's monopoly power. Patients in southwest Lucas County, including Maumee, who face emergencies can be most conveniently seen today at St. Luke's emergency department and immediately hospitalized at that facility if necessary. The new ProMedica facility will not provide

31

greater convenience for any patients. Moreover, patients who utilize the new ProMedica facility would need to be transferred to a ProMedica hospital, as much as 30 minutes away, after being seen at the emergency department. (ProMedica's announcement specifically stated that the plan was to transfer patients needing further care to Toledo Hospital.) These delays could often be detrimental to patient care.

105.    The planned ProMedica emergency center therefore serves no purpose whatsoever in the community, and can result in poorer medical care for patients. Moreover, the emergency department is highly likely to be unprofitable, since it will serve a patient population already well served by the emergency department at St. Luke's. The only possible reason for ProMedica to pursue this emergency department is to harm St. Luke's in order to increase its monopoly power. St. Luke's, like most hospitals, depends on emergency room visits for a significant number of its inpatient admissions.   Therefore, these actions will increase ProMedica's dominance in the relevant hospital markets.

106.    ProMedica announced this emergency department on May 14, 2020, after it was well known that McLaren would be acquiring St. Luke's. The action was clearly taken in an effort to prevent further competition from St. Luke's and cause serious damage to St. Luke's. The facts indicate that the decision to go forward with the emergency center and the announcement regarding the emergency center were rushed out by ProMedica in response to the impending affiliation between McLaren and St. Luke's. An option on the land on which the emergency center is to be erected was purchased only a few days before the announcement was made. At the time the announcement was made, there had been no contact with the City of Maumee or its planning commission regarding this project. This indicates that the project was not undertaken by

32

ProMedica as part of any well considered business decision to better serve the community or even to earn profits. It was undertaken for one purpose only; to harm St. Luke's.

107.    These facts establish beyond doubt that ProMedica's actions with regard to St. Luke's and UTMC were not undertaken in order to serve any reasonable or legitimate business interest, were unrelated to any efficiency concerns, and certainly did not reflect competition on the merits. They were exclusionary, and were undertaken only to harm St. Luke's ability to compete and to maintain and expand ProMedica's monopoly power in the relevant markets. This is demonstrated by, among others, the following facts:

      a.    ProMedica executives effectively admitted that fact in calls with Kathy Kendall of McLaren and State Representative Jason Sheppard.

      b.    Paramount terminated St. Luke's contracts and ProMedica terminated McLaren Health Plan's contracts. ProMedica terminated eight different contracts with St. Luke's on the same day, five days after the long time CEO of St. Luke's was retired and replaced by an interim McLaren executive. The only common factor underlying these actions is the affiliation between McLaren and St. Luke's.

      c.    ProMedica's actions ended long-term profitable arrangements in each instance where it terminated a relationship.

      d.    ProMedica's actions were often opposed even by its own personnel operating in the areas where the arrangements were terminated, thereby demonstrating that there was no rational business purpose for these actions.

33

e.  ProMedica's decision to open up an emergency department in close proximity to St. Luke's makes no economic sense, and was also undertaken only after it became clear that McLaren would be acquiring St. Luke's.

108.   Paramount's decision to terminate St. Luke's under the change in control provision is reflective of the fact that Paramount's and ProMedica's actions were taken pursuant to a conditional refusal to deal. Paramount did not have the ability to terminate St. Luke's unless St. Luke's engaged in a change in control, bringing in an affiliation partner. Thus, ProMedica effectively stated to St. Luke's that if it avoided an affiliation partner, and continued to operate on its own, without any help in addressing its financial weaknesses, then Paramount would not take any action against St. Luke's. If, however, St. Luke's tried to obtain a partner to improve its overall position and therefore its competitiveness, it would be punished by ProMedica and Paramount.

## INJURY TO ST. LUKE'S

109.   The loss of the Paramount contracts will have a devastating financial impact on St. Luke's. Paramount represents fully more than 20% of St. Luke's commercially-insured and Medicare Advantage business. It is likely that a substantial portion (if not the majority) of that business will be lost by St. Luke's if the termination is allowed to become effective. St. Luke's has earned more than $25 million in annual payments relating to the care of Paramount's commercially insured and Medicare Advantage members.

110.   While some individual patients who value St. Luke's and its physicians may have an opportunity to switch health plans as a result of Paramount's termination, that will only be true of those individuals whose employers offer them a choice of health plans. Most employers do not offer such a choice, and most employers have chosen their health plans for a given year by September of the prior year. As a result, the Paramount notice of termination of St. Luke's has occurred too late for most employers to take the termination of St. Luke's into consideration in

34

choosing the health plan options for their employees. Individuals whose employers have chosen only Paramount as a health plan will therefore be forced to switch providers from St. Luke's, whether or not they wish to do so.

111.    Paramount's HMO exercises significant control over its members' abilities to utilize out-of-network physicians. With few exceptions (*e.g.,* emergency medical conditions), Paramount's HMO requires its members' primary care physicians—Paramount network physicians—to arrange for all of the medical services of its members. A Paramount HMO member cannot independently seek the services of an out-of-network physician. Nor can a primary care physician refer a Paramount HMO member to an out-of-network physician. Rather, Paramount HMO itself must approve any referral to an out-of-network physician. Other Paramount members will need to pay substantially higher amounts in co-insurance, co-payments and/or deductibles if they wish to utilize out of network products such as St. Luke's and WellCare.

112.    The loss of Paramount patients is especially important because St. Luke's, like any hospital, depends on the more profitable commercially insured patients to offset the costs of providing care to patients who do not have the ability to pay at all for health care, as well as patients insured by Medicare and Medicaid, for whom reimbursement is lower.

113.    The loss of significant numbers of incremental patients will be especially costly to St. Luke's, as it would be to any hospital. Since most of St. Luke's costs are fixed, and do not vary with the volume of patients, each additional patient gained or lost results in a significant amount of incremental profit or loss, since the only additional costs incurred in connection with the treatment of those patients are variable costs. Approximately 60% of St. Luke's costs are fixed, and therefore each incremental commercially insured patient earns St. Luke's the payments for that patient less only about 40% reflecting the incremental cost of treating that patient. Therefore,

the gain or loss of such incremental patients is critical to St. Luke's bottom line, and the loss of such patients has a disproportionate effect on the bottom line. Additionally, because St. Luke's is already a very low cost hospital, it does not have a significant opportunity to further reduce costs in response to lost revenue, a dynamic which will only exacerbate its losses as a result of Paramount's actions.

114.    For these reasons, the damages to St. Luke's from ProMedica's actions, if carried out, will undoubtedly be substantially greater than $10 million.

115.    While St. Luke's will suffer substantial monetary damages as described above, these damages will certainly be inadequate to compensate St. Luke's for the injury described above, and this injury will be irreparable and substantial. This injury includes the severe harm to St. Luke's reputation, competitiveness, good-will and market position, as described below.

116.    Because the loss of these commercially insured patients will force St. Luke's to incur substantial overall losses, this will limit St. Luke's ability to finance additional competitive initiatives and improvements in its facility and equipment. It will thereby hamper St. Luke's ability to compete effectively, and to improve care for its patients. This will be especially damaging given St. Luke's already precarious financial situation.

117.    Paramount's actions will also be irreparable, because once St. Luke's patients who are insured by Paramount are treated by local physicians and hospitals who are in network with Paramount, those new physicians and hospitals will then establish relationships with these patients. Even if St. Luke's were to regain participating status with Paramount in the future, that would likely be too late for it to regain many of these patients. Academic studies have concluded that patients are very reluctant to change providers absent a strong reason to do so.

36

118.    The injury to St. Luke's from the Paramount notice of termination will extend well beyond the Paramount subscribers who have been patients at St. Luke's or utilized St. Luke's physicians. That is because physicians value their time, and do not wish to work at multiple hospitals unnecessarily. In particular, surgeons often have "block time" scheduled, so they can perform all their surgeries in one location at one time, and gain efficiencies by that process. As a result, many independent physicians will likely conclude that if they have significant numbers of patients who are out of network with Paramount, a significant insurance plan, they are better off treating all their patients at a hospital other than St. Luke's, to avoid the inconvenience of providing treatment at other hospitals for Paramount subscribers.

119.    The Paramount notice of termination will also cause significant injury to St. Luke's reputation and good will. Many patients and subscribers will not be aware of the reason for the termination. Paramount has not stated the reason in any of its communications to its members. As a result, many of these members will likely believe either that St. Luke's has chosen to leave the Paramount network or that St. Luke's was terminated from the network because of quality or other problems with its care. This will cause significant long-term damage to St. Luke's ability to serve patients in the relevant market.

120.    For all these reasons, it will be impossible for Plaintiffs to calculate the full amount of the damages they will suffer from Defendants' actions. The damages to St. Luke's will result from, not only the immediate loss of patients, but the loss of patients over many years in the future. The damages will be caused by not only the direct loss of revenues from Paramount members but also from the impact of these financial losses on St. Luke's ability to further invest in its facilities and operations and expand its revenues. St. Luke's will also suffer damages from the impact on loss of business on physicians who moved their cases elsewhere, not only for Paramount patients,

37

but for other patients, as described above. All these complexities make a calculation of all of St. Luke's damages impossible. Therefore the only way to avoid uncompensable injury here is for an injunction to issue.

121.    The public will also be seriously harmed by a Paramount termination. This will keep residents of the Maumee and surrounding area from utilizing their preferred and more convenient hospital and doctors. Additionally, if the termination is effective, it will require patients to switch from a lower cost hospital (St. Luke's) to substantially higher cost hospitals (the ProMedica hospitals). This will add expenses for their employers (if self-insured) and for the patients themselves (to the extent that they pay co-payments, co-insurance and deductibles).

122.    This substantial clear and imminent irreparable injury justifies injunctive relief. In contrast to this injury to St. Luke's and the public if an injunction is denied, there will be no cognizable injury to Paramount if an injunction is granted. Paramount has profited from its relationship with St. Luke's, which has been in place since 2010 (for St. Luke's Hospital) and since 2008 (for its physicians). Paramount had agreed to maintain this relationship unless St. Luke's were acquired. That acquisition does not create any harm at all to Paramount. It matters only to the anticompetitive aims of ProMedica. Therefore, the balance of injuries here clearly favors injunctive relief.

123.    Injunctive relief will strongly benefit the public. It will allow individuals who wish to utilize St. Luke's Hospital and its physicians, but who are locked into Paramount's insurance at this time because of the lateness of Paramount's decision, to continue to use their preferred providers. It will also help maintain competition in the market and allow St. Luke's to continue to provide high quality care and to improve its offerings to the community.

## TWO STAGE MODEL OF COMPETITION

124.    Competition among health care providers depends on the relationship between these providers and employers, subscribers, and managed care plans. Employers select managed care plans on behalf of their employees. When managed care plans create networks, their goal is to offer convenient networks for their enrollees. Employees and subscribers prefer to have a choice from a variety of providers in convenient locations, close to home.

125.    Employers generally have two alternative funding mechanisms for purchasing health insurance for their employees. Fully insured employers and their employees pay premiums, co-pays and deductibles in exchange for access to a managed care plan's provider network and for insurance against the cost of future care. Self-insured employers must pay the entirety of their employees' healthcare claims (aside from member cost-sharing, such as deductibles and co-payments), and, as a result, they immediately incur any provider rate increases.

126.    Managed care plans negotiate contracts with hospitals and physicians to create provider networks. Employees pay higher out-of-pocket costs when they see a non-contracted or out-of- network provider. Patients who are insured through a managed care plan therefore have an incentive to choose in-network providers in order to minimize or avoid out-of-pocket expenses, and providers have incentives to participate in managed care plans' networks because that increases their access to patients insured through those organizations.

127.    Competition among health care providers (both physicians and hospitals) occurs in two stages. In the first stage, providers compete to be selected as in-network providers by managed care plans. Managed care plans seek to create provider networks with geographic coverage and a scope of services sufficient to attract and satisfy individual subscribers as well as employers and their employees.

128. Providers benefit from in-network status by gaining access to the managed care plan's members as patients. Accordingly, providers compete in this first stage of competition to be selected as "in-network" by healthcare payors.

129. In the second stage of competition, providers compete with other in-network providers to attract patients. When enrollees sign up to a plan, they almost always choose in-network providers. Managed care plans typically offer multiple in-network providers with similar out of pocket costs, and those providers compete primarily on non-price dimensions in this second stage to attract patients by offering better services, amenities, convenience, quality of care, and patient satisfaction than their competitors offer. Patients are insulated against prices paid to providers, do not have a lot of transparency about those prices, and do not shop around on the basis of price.

130. Some managed care plans offer "tiered networks," with different financial incentives for patients who choose different providers, or "narrow" networks offering limited numbers of providers. In such tiered networks, providers in the preferred tier may be used with fewer (or no) co-pays or deductibles payable by the member as compared to their payment obligations when they utilize "tier 2" providers. Under these circumstances, providers may compete to be in the preferred tier or in the narrow network. However, tiered networks are not popular if sought after providers are not included in the preferred tier, and therefore can only be used if the member is subject to higher co-pays or deductibles. Employers need to offer a health plan that appeals to all their employees.

131. Therefore, most individual employees and patients have no incentive to shift to other providers even if their providers raise prices. The financial impact of such price increases is borne by the employer, not by the individual employee.

40

132.    As a result, pricing discipline does not take place based on decisions by insured patients choosing providers. Rather, bargaining dynamics between providers and managed care plans determine health care prices. Consumers of health care are typically not direct purchasers of health care, and it is health insurers that are negotiating with providers.

133.    When managed care plans negotiate with providers, the leverage in those negotiations depends on the plan's outside options. A buyer has leverage if it has acceptable alternatives to a seller driving a hard bargain. Therefore, if a managed care plan could drop a provider and still have an attractive network that it could sell to its customers, the managed care plan would have a stronger bargaining position. For these reasons, the fewer alternative providers available to a managed care plan, the more bargaining leverage each of those providers has. Similarly, the larger the market share of a given provider, the more important its presence in a network is to a managed care plan, and the more leverage it has in bargaining for higher reimbursement rates.

## **RELEVANT MARKETS**

134.    Among the relevant markets applicable to these claims are the market for general acute care inpatient hospital services for commercially insured patients in the Lucas County area (both including and not including obstetrics patients).

135.    There is no substitute for inpatient services (which generally are defined to include at least one overnight stay in a hospital). Where an overnight stay is medically required, outpatient services are not an acceptable alternative. When an overnight stay is not medically required, payers do not view inpatient services as an acceptable alternative, and hospitals do not reduce the prices of inpatient procedures to meet the price of procedures on an outpatient basis.

136.    These markets do not include tertiary or quaternary services, which are highly complex services not offered by all hospitals. These services are highly specialized and usually

41

involve treatment for higher acuity conditions. Patients often travel greater distances for tertiary and quaternary services, because they are offered at fewer facilities, and because they often involve more serious conditions. The FTC Administrative Law Judge in the FTC's case challenging ProMedica's acquisition of St. Luke's found that quaternary services are often excluded in managed care organizations' contracts with hospitals or are contracted for separately.

137.    Health care services provided to commercially insured patients, are in a distinct market from those services when provided to other patients. Most insured consumers of health care are covered either by one of two government insurance programs (Medicare and Medicaid) or by private insurance organizations. The relevant markets do not include services paid for by Medicare or Medicaid, because these government programs fix their fees and therefore do not compete for these services. A hospital could not increase its volume or revenue by persuading patients to sign up for Medicare or Medicaid, because enrollment in these programs is limited to the elderly, disabled or underprivileged. Medicare and Medicaid typically pay significantly lower rates than do commercial insurers and, therefore, are not an alternative to them.

138.    Individual hospitals or hospital systems have no ability to determine the fees that Medicare and Medicaid pay them, and therefore cannot exercise market power with respect to reimbursement by government payers. However, hospitals negotiate the rates that private insurance companies pay, and they ordinarily charge private payers substantially more than they are paid by either Medicare or Medicaid. Market power can be a factor in these negotiations.

139.    The FTC found in its case against ProMedica that general acute care inpatient hospital services sold to commercial health plans, excluding tertiary and quaternary services, are relevant product markets. This conclusion was affirmed by the Sixth Circuit Court of Appeals. FTC Commission Decision at *568.

140.    Another relevant product market in this case is the market for hospital inpatient obstetrical services offered to commercially insured patients in the Lucas County Market. These services are provided by physicians specializing in obstetrics and gynecology (OB/GYN) to women during pregnancy, childbirth, and postpartum periods. Typical inpatient obstetrical procedures include the management of labor and delivery, Cesarean delivery, hysterectomy, and the surgical treatment of postpartum hemorrhage.

141.    There are no substitutes for obstetrics ("OB") services. The FTC, Judge Katz, and the Sixth Circuit all defined OB services as a separate product market. OB services are not offered by many hospitals in Lucas County (for example, UTMC and Mercy St. Anne Hospital), and therefore are subject to different competitive conditions than are general acute care services. ProMedica has a significantly higher share in OB services than it has in general acute care inpatient services. The Sixth Circuit noted that ProMedica's market share for OB services was more than half again greater than its market share for non-tertiary inpatient services. Sixth Cir. Decision at 566. The FTC found that the availability of competitive alternatives for consumers of OB services therefore differed substantially as compared to the alternatives for consumers of inpatient hospital services generally. Sixth Cir. Decision at 566.

142.    Obstetrics is recognized as a separate field of medicine with distinct providers of OB services. The FTC found that hospitals track OB services market shares separately from general acute care inpatient services.

143.    Another relevant product market applicable to these claims consists of hospital outpatient surgical (excluding endoscopies), emergency and imaging services provided to commercially insured patients. The outpatient surgery services market does not include general acute-care inpatient hospital services (those requiring an overnight hospital stay). Patients

43

receiving inpatient services, do so because either they are too sick to receive care on an outpatient basis or because at least some of the procedures they require are sufficiently serious that an inpatient stay is necessary. As a result, general acute-care inpatient hospital services are not reasonable substitutes for outpatient surgery services.

144.    Some outpatient procedures and services are also provided in non-hospital settings, such as ambulatory surgery centers ("ASC"), imaging centers, and doctors' offices. However, there are important differences between hospital-based outpatient services and outpatient services provided in other settings.

145.    While some patients may choose non-hospital outpatient facilities for outpatient care, non-hospital facilities are not a substitute for hospitals for outpatient care in health plans' networks. No health plan in Lucas County has excluded any hospital outpatient services from a network in favor of non-hospital services. This is true for several reasons. Many patients prefer to utilize their hospitals for outpatient as well as inpatient services. Additionally, many patients who are elderly or who have other ailments need to have these services provided in a hospital setting so that more extensive backup services such as intensive care units are available if a problem should occur. Physicians located on hospital campuses prefer to refer their patients needing outpatient services to facilities on those campuses for convenience, and often prefer to refer their patients to hospital facilities because they share common electronic medical records with the hospitals. It is also more convenient and efficient for physicians to perform their surgeries, including their outpatient surgeries, at the same locations as their inpatient surgeries.

146.    One important area of outpatient care, emergency services, has several characteristics that give the hospital setting an important advantage. Hospital and hospital-owned emergency departments provide a higher level of service than other outpatient providers, including

44

24-hour access, specialized physicians and other personnel, and equipment and facilities capable of handling complex problems. While some patients receiving care in the emergency department could have received care in non-hospital facilities, academic research has shown that these non-hospital facilities are not a substitute for hospital and hospital-owned emergency departments. For example, one academic study found that opening retail clinics near hospitals does not lead to a decrease in the volume of visits to the hospital emergency rooms, even for low-acuity visits, while another study found that urgent care centers are less likely to be staffed with specialists and do not come close to the 24-hour access available at hospital emergency departments. According to a 2016 National Health Statistics Report by the Centers for Disease Control and Prevention, the primary reason for a visit to the emergency room was the seriousness of the medical condition. Non-hospital facilities, instead of substituting for emergency rooms, address unmet demands and treat patients who have different needs and motivations than patients who seek care at hospital rooms.

147.    One study found that ASC entry did not have a significant impact on hospitals' outpatient surgical volume, indicating that patients do not see surgeries at ASCs as substitutes for surgeries at hospitals. Another study found that hospitals saw much larger price increases than ASCs for the same outpatient procedures between 2007 and 2012, indicating the differences in the competitive conditions facing ASCs and hospitals even for the same procedures. According to another study outpatient procedures and services delivered in hospitals are often reimbursed at a higher rate than those delivered at a non-hospital setting.

148.    For all these reasons, no health plan in Lucas County would offer a network excluding hospital outpatient surgery, emergency or imaging services. If it did so, subscribers who wished to utilize hospital services in these areas, and as a result their employers, who wished to

satisfy the preferences of most of their employees, would reject the offerings by such plans. Therefore, the provision of these outpatient services by non-hospital entities are not a substitute for hospital outpatient services in health plans' networks. Additionally, there are very few outpatient surgery services offered in Lucas County except through entities owned in whole or in part by hospitals.

149.    Another relevant product market in this case is the market for hospital inpatient and outpatient hospital ENT (Ear, Nose and Throat) services offered to commercially insured patients. These services are provided to patients with head and neck diseases including: major head and neck surgical procedures; cranial/facial surgical procedures; sinus and mastoid surgical procedures; surgical procedures on the mouth; cosmetic and reconstructive surgery; and cranial base procedures (tumors and disorders of the base of the skull). No other services are substitutes for inpatient ENT services, since only these services suffice to treat the ailments described above and other ailments for which ENT services are offered. Competitive conditions relating to ENT services are different from those for general acute care services as a whole, since ProMedica's abandonment of St. Luke's Hospital by ProMedica's employed ENT surgeons has had a specific competitive effect on the ENT market.

150.    Another relevant product market in this case is the market for hospital inpatient cardiothoracic surgery services ("CT surgery services") offered to commercially insured patients. These services are provided to patients with diseases of the heart, lungs, esophagus, and other organs of the chest, including, among others, coronary artery disease, valvular insufficiency, congestive heart failure, heart attack, aneurysms, and lung cancer. CT surgeries are performed by physicians specializing in cardiothoracic surgery. Typical cardiothoracic surgeries include: coronary artery bypass grafting ("CABG"), mitral and aortic valve repair and replacement, surgical

treatment of aortic aneurysms and dissections, implantation of cardiac support devices, and lung and esophageal resection. No other services will substitute for CT surgery, since that surgery is designed to specifically address certain cardiovascular ailments for which surgery is necessary. Competitive conditions differ in the CT surgery market as compared to the general acute care market, because of the specific impact on the CT surgery market of ProMedica's actions withdrawing its CT surgeons from St. Luke's.

151.   Another set of product markets consists of each of the groups of services described above, but provided to Medicare Advantage subscribers, rather than to commercially insured patients. Unlike traditional commercial insurance, Medicare Advantage is only available to individuals who are eligible for Medicare, and therefore is not a substitute for commercial insurance. Medicare Advantage also represents a distinct market from traditional Medicare. Medicare Advantage offers substantial additional benefits as compared to basic Medicare. Studies have found that 80% of the individuals who switch away from a particular Medicare Advantage plan switch to another Medicare Advantage plan rather than to basic Medicare. Academic studies show a distinct preference for Medicare Advantage among its subscribers as compared to traditional Medicare.

152.   Lucas County is a relevant geographic market with respect to each of these product markets. Virtually all Lucas County residents who receive inpatient or outpatient hospital services receive them in Lucas County; only a very small percentage (less than 5%) of those residents leave the county for hospital care. Patients seek convenient hospital care, and therefore seek to obtain that care close to home. That causes patients in Lucas County to seek their care in Lucas County.

153.   Commercial payors therefore need a broad range of Lucas County area hospitals in order to attract employers and subscribers from the Lucas County area. For that reason, no health

47

plan has ever offered a product to Lucas County employers or Lucas County residents that did not include Lucas County facilities in its network.

154.    Lucas County was found to be the relevant geographic market by the Federal Trade Commission, Judge Katz and the Sixth Circuit.

155.    For each of the foregoing reasons, a hypothetical monopolist in any of the relevant markets described above could profitably impose at least a small but significant price increase. This is the test for market definition under the Department of Justice/Federal Trade Commission Merger Guidelines, which are widely followed by the courts.

## ANTICOMPETITIVE EFFECTS

156.    These actions will cause serious harm to the public and to competition in the relevant markets for several reasons.

157.    First, Paramount members in the Maumee area will now have to travel significantly farther for hospital care, and will be effectively unable to use their most convenient source of hospital care, St. Luke's, their neighborhood hospital.

158.    Second, St. Luke's is by a significant margin the lowest cost hospital system in the relevant markets. In contrast, ProMedica is the highest cost hospital system in Lucas County. In fact, measured by net revenues or total expenses per adjusted discharge based on Medicare cost reports, ProMedica is 50%-60% higher than St. Luke's. Therefore, Paramount's actions will weaken the low cost alternative in the market, and strengthen the high cost alternative. This will seriously harm purchasers of health care.

159.    Additionally, St. Luke's is a high quality hospital, and the lessened availability of its high quality services will also harm quality competition and consumers. There is substantial evidence to support this conclusion. Most recently, St. Luke's has been listed as one of America's 100 best orthopedic surgery hospitals and has received a stroke care excellence award from Health

48

Grades. Judge Katz found that "ProMedica documents reflect patients' awareness that St. Luke's was a high-quality hospital, often scoring better than ProMedica at quality rankings . . . health plans have testified that St. Luke's is an attractive and valuable hospital for their Lucas County provider networks because it provides high-quality services." Judge Katz Decision at *30. Additionally, Judge Katz noted that St. Luke's is regularly recognized by third party quality ratings organizations "that rank St. Luke's within the top 10% of hospitals nationally . . ." Judge Katz Decision at *30. Judge Katz also noted that "independent physicians testified that St. Luke's quality was higher than ProMedica's" (Judge Katz Decision at *30) and that "[e]mployers and community organizations have testified that St. Luke's is committed to delivering high-quality patient-minded care." Judge Katz Decision at *31. Judge Katz added that "St. Luke's achievements in clinical quality exceed those of TTH [The Toledo Hospital] and Flower, its closest competitors in the ProMedica system for inpatient services." Judge Katz Decision at *29. The same conclusions were reached by the Federal Trade Commission's Administrative Law Judge. ALJ Decision at *75.

160.    Third, if St. Luke's fails to receive the additional funds that it would obtain but for ProMedica's threatened actions, it would be less able to engage in substantial additional competitive activities, including additional marketing, facility improvements, and expansion of programs and services, with regard to services in all the relevant markets.

161.    Fourth, the suppression of competition from St. Luke's is especially important because St. Luke's is one of only three competitors in hospital services generally (including ENT and CT surgery services) that can constrain the exercise of monopoly power by ProMedica. Yet UTMC, as described above, has been substantially weakened by ProMedica's anticompetitive actions. As also described above, Mercy's flagship hospital, St. Vincent, is not fully competitive

49

with ProMedica. Under the circumstances, the weakening of the third competitor, St. Luke's, will be especially injurious to competition in the market and to the health plans, employers, and patients who depend on healthy competition in Lucas County.

162.    Competition will also be harmed because ProMedica's threatened actions will significantly reduce the competitive constraint on ProMedica by its closest substitute in St. Luke's core service area in southwest Lucas County. The reduction of competition between close substitutes is recognized as an important anticompetitive effect by the Department of Justice/Federal Trade Commission Merger Guidelines, which are often utilized as guidance in antitrust analysis.

163.    ProMedica competes directly with St. Luke's in its core service area, including the area around Maumee and the Arrowhead neighborhood. ProMedica has a family practice office in Maumee, an urgent care center in Maumee, a laboratory site in Arrowhead, a cancer center on St. Luke's campus, an ENT office on St. Luke's campus, and ProMedica Physicians Cardiology has an office in Maumee. All these offices are indicative of ProMedica's direct competition with St. Luke's in southwest Lucas County.

164.    The fact that these entities are close substitutes was recognized repeatedly in the FTC and court decisions relating to the ProMedica-St. Luke's merger. For example, the Sixth Circuit noted that ProMedica viewed St. Luke's as a "strong enough [competitor] that ProMedica offered at least one MCO a 2.5% discount off its rates if the MCO excluded St. Luke's from its network." Sixth Cir. Decision at 563. The Federal Trade Commission found that "St. Luke's was the next best substitute for a substantial and important fraction of ProMedica's patients, stemming from St. Luke's advantageous location in southwest Lucas County." FTC Commission Decision at *39. The Commission also noted that "analysis of market shares by zip code shows that

ProMedica and St. Luke's are the most important hospitals for patients in southwest Lucas County." FTC Commission Decision at *39. Similarly, the FTC Administrative Law Judge found that "[a]ccording to internal documents, in St. Luke's core service area, St. Luke's and ProMedica had the first and second highest inpatient market shares . . ." ALJ Decision at *48, *131. The Administrative Law Judge also noted that "in 2007, ProMedica and St. Luke's accounted for 66 percent of the inpatient market share for all patients in St. Luke's core service area . . ." ALJ Decision at *49.

165.    Additionally, St. Luke's is one of only two competitors to ProMedica in obstetrics services, since UTMC does not offer obstetrics services. Therefore, diminution of St. Luke's competitive abilities will particularly reduce the competitive constraint on ProMedica in the relevant obstetrics markets and thereby allow ProMedica to further entrench its monopoly position in these markets.

166.    Since ProMedica has a dominant market share in both inpatient ENT surgery and inpatient CT surgery, any significant diminution in volume at St. Luke's, one of the few competitors to ProMedica in these markets, will increase ProMedica's already dominant market share and thereby harm the overall state of competition in the market.

167.    Any reduction in St. Luke's market position is likely to increase ProMedica's share, and thereby to increase market concentration. Economic research overwhelmingly shows that high market concentration substantially increases hospital prices. The relevant studies have concluded that when hospital markets become highly concentrated, with few competitors and high market shares, prices generally substantially increase:

        a.    A 2011 study examined the effect of hospital market concentration on specific procedures. It found that in concentrated hospital markets, hospitals

charged 29% more for cervical fusion, 31% more for lumbar fusion, 45% more for total knee replacement, 49% more for total hip replacement, 50% more for angioplasty, and 56% more for CRM device insertion. James C. Robinson, *Hospital Market Concentration, Pricing, Profitability in Orthopedic Surgery and Interventional Cardiology*, 117(6) THE AM. J. OF MANAGED CARE e241, e244 (2011).

b.  One study from 2009 looked at the effect of hospital mergers and consolidations (and the resulting increase in market concentration) on the prices charged by nearby "rival" non-merging hospitals across the United States from 1989 to 1996. It found that non-merging hospitals increased prices 40 percent in response to hospital mergers. Leemore Dafny, *Estimation and Identification of Merger Effects: An Application to Hospital Mergers*, 52 J. L. & Econ. 523, 544 (2009).

c.  Health Affairs published a 2005 study looking at the effect of hospital consolidation through system acquisition (i.e. a hospital joining a wider hospital system). It found that "managed care prices were higher in system hospitals than in nonsystem hospitals by an average of $103 per day." Alison Evans Cuellar and Paul J. Gertler, *How the Expansion of Hospital Systems has Affected Consumers*, 24(1) HEALTH AFFAIRS 213, 217 (Jan. 2005).

d.  A 2011 study examined the effect of concentrated hospital markets on hospital prices in 2001 and 2004. It concluded that "hospital prices are higher in more concentrated markets" and that a "1,000-percentage-point

increase in the Shreveport hospital concentration index raises prices by approximately 8.3 percent." Glenn A. Melnick, Yu-Chu Shen and Vivian Yaling Wu, *The Increased Concentration of Health Plan Markets Can Benefit Consumers through Lower Hospital Prices*, 30(9) HEALTH AFFAIRS 1728, 1729-31 (2011).

e.   Another study of hospital mergers found that "[i]ncreases in hospital market concentration lead to increases in the price of hospital care." Martin Gaynor and Robert Town, The Impact of Hospital Consolidation—*Update*, Robert Wood Johnson Foundation, THE SYNTHESIS PROJECT (June 2012) at 1.

f.   A study published in the journal *Medical Care* finds that increases in the concentration of inpatient hospital services are associated with increases in outpatient hospital prices, as well as inpatient hospital prices. Baker LC, Bundorf MK, Kessler DP, *Competition in Outpatient Procedure Markets,* MEDICAL CARE 2019; 57:36-41.

168.   In addition, recent economic studies have established that the control of large numbers of physicians by hospitals substantially increases prices and costs:

a.   One study found that "total per-beneficiary spending was $849 higher" at hospital-based physician groups. J. Michael McWilliams et al., *Delivery System Integration and Health Care Spending and Quality for Medicare Beneficiaries*, 173 JAMA INTERNAL MED. 1447, 1451 (June 17, 2013). That study also found that "[patient] readmission rates were highest for hospital-based groups." *Id.* at 1452.

b.    Another study found that "recent increases in the employment of physicians and acquisition of community-based physician practices by hospitals . . . result[ed] in more and more services being paid at higher hospital outpatient rates." James D. Reschovsky and Chapin White, *Location, Location, Location: Hospital Outpatient Prices Much Higher than Community Settings for Identical Services*, 16 NAT'L INSTITUTE FOR HEALTH CARE REFORM 2 (June 2014). This study found that hospitals charged $919 for MRI scans versus $606 in community settings; $1,383 for colonoscopies versus $625 in community settings; $37.11 for a comprehensive metabolic panel versus $12.75 in community settings; and $58 per 15-minutes of manual physical therapy versus $35 per 15-minutes in community settings. *Id.* at 2-3.

c.    Yet another study found that "[v]ertical integration . . . lead[s] to statistically and economically significant increases in hospital prices and spending. This is consistent with the hypothesis that vertical integration increases hospitals' market power." Laurence C. Baker et al., *Vertical Integration: Hospital Ownership of Physician Practices Is Associated with Higher Prices and Spending*, 33 HEALTH AFF. 657 (May 2014).

d.    A 2018 meta-analysis (i.e., an analysis of several studies) of the empirical economic literature published in the peer-reviewed *Medical Care Research and Review* concludes that "vertical integration [between hospitals and physicians] poses a threat to the affordability of health services." Post B, Buchmueller T, Ryan AM, *Vertical Integration of Hospitals and*

*Physicians: Economic Theory and Empirical Evidence on Spending and Quality*, MEDICAL CARE RESEARCH AD REVIEW 2018; 75(4):399-433, 399.

169.     As a result of the suppression of competition by St. Luke's, ProMedica will become even more essential for managed care plans seeking to serve companies with employees in Lucas County, because a weakened St. Luke's will be a less attractive alternative to ProMedica, and will make it even more difficult for health plans to develop an alternative network of hospitals without ProMedica. This significant change in the negotiating dynamic will give ProMedica enhanced bargaining clout in contract negotiations and the ability to extract even higher rates for services. Thus, it will increase ProMedica's already significant monopoly power.  This was a critical concern raised by the FTC and the courts in evaluating ProMedica's acquisition of St. Luke's. FTC Commission Decision at *37-38, *41, *45, *53.

170.     Price increases resulting from the transaction will be passed on to local employers and their employees. Self-insured employers pay the full cost of their employees' health care claims and, as a result, they will immediately and directly bear the full burden of higher rates. Fully-insured employers will also inevitably be harmed by higher rates, because health plans will be forced to pass on at least a portion of hospital rate increases to these customers.

171.     Employers, in turn, will pass on their increased health care costs to their employees, in whole or in part. Employees will bear these costs in the form of higher premiums, higher co-pays, reduced coverage, and/or restricted services. Some Lucas County residents will undoubtedly forego or delay necessary health care services because of the higher costs, and others may drop their insurance coverage altogether.

172.    Moreover, the further entrenchment of ProMedica would weaken any incentives for ProMedica to control costs, improve quality, or take the steps to transform health care that are proceeding across the United States. Without the spur of competition, the risk is that health care will stagnate in the Lucas County area to the detriment of the public.

173.    Economic research also reveals that high concentration, and less competition, can result in poorer health care quality. One study found that "the evidence suggests that increasing hospital concentration lowers quality." William B. Vogt and Robert Town, *How has hospital consolidation affected the price and quality of hospital care?*, Robert Wood Johnson Foundation, THE SYNTHESIS PROJECT 4, 8-9 (Feb. 2006). The 2012 update to the Synthesis Project stated that all of the U.S. studies except for one found that competition improves quality." Martin Gaynor and Robert, *The Impact of Hospital Consolidation*-Update, Robert Wood Johnson Foundation. THE SYNTHESIS PROJECT 4 (June 2012). Other recent studies confirm that greater concentration is associated with poorer quality. Koch TG, Wendling BW, Wilson NE, *Physician Market Structure, Patient Outcomes, and Spending: An Examination of Medicare Beneficiaries*, Health Services Research 2018; 53(5):3549-3568.

174.    The FTC Administrative Law Judge, Federal Trade Commission, Judge Katz, and the Sixth Circuit all concluded that the elimination of independent competition from St. Luke's through its acquisition by ProMedica would substantially harm competition. Similarly, the significant weakening of St. Luke's by ProMedica, as threatened here, in a market where another competitor, UTMC, has already been significantly weakened, would certainly substantially harm competition.

175.    Given ProMedica's dominant position in the relevant markets, and the fact that St. Luke's is one of only two significant competitors to ProMedica in those markets, even a small

change in market shares is competitively significant. Analysis of the Federal Merger Guidelines standards thus supports the conclusion that these transactions would be highly anticompetitive. The Merger Guidelines measure market concentration using the Herfindahl-Hirschman Index ("HHI"). The HHI measures the sum of the squares of the market shares of the competitors in a market. Under the Merger Guidelines' HHI test, a merger is presumed likely to create or enhance market power (and presumed illegal) when the post-merger HHI exceeds 2500 points and the merger or acquisition increases the HHI by more than 200 points.

176.    Under this analysis, even a small shift of Paramount business from St. Luke's to ProMedica would be significantly anticompetitive here. Because concentration in the relevant markets is already great, even slight increases in concentration create serious antitrust problems. ProMedica's actions with regard to Paramount, if not enjoined, would threaten an increase in the HHI in the market for general inpatient acute care services provided to commercially insured patients of more than 200 points to more than 3700. In the corresponding obstetrics services market these actions threaten to cause an increase of more than 230 points to more than 5300. Therefore, the market concentration levels after ProMedica's actions (if not enjoined) would be substantially above the levels at which the Federal Trade Commission presumes market power.

177.    Neither hospital entry nor expansion by any hospital will deter or counteract the anticompetitive effects described herein, for multiple reasons. New hospital entry or significant expansion in the Lucas County area would not be timely. Construction of a new general acute-care hospital would take substantially more than two years from the initial planning stages to opening doors to patients. Entry and expansion are also unlikely due to very high construction costs, operating costs, and financial risk. Constructing a new hospital requires an extraordinarily large, up-front capital investment, and the pay-off is risky and deferred into the future, which makes it

highly unlikely that a new hospital competitor will enter the Lucas County hospital market. These barriers to entry also preclude the establishment of additional inpatient obstetrics, ENT or CT surgery services, as well as outpatient hospital surgery, emergency or other imaging services, since no new entrant could establish those services except as part of a hospital. No entrant has attempted to add these services in Lucas County at any time.

178.    Entry into the performance of obstetrics, inpatient CT surgery or ENT surgery requires specialized equipment, adequate operating rooms, and labor and deliver rooms, specially trained nursing staff, and access to an intensive care unit and other backup for the treatment of potentially severely ill patients. Therefore, these services cannot be provided except in a general acute care inpatient hospital.

179.    Judge Katz addressed in detail the issue of barriers to entry and found specifically that entry would be difficult and would not occur in a timely way. This would be true because of the time requirements for zoning, licensing and regulatory permits, the great expense involved in building a new hospital and the difficulty for a new hospital in establishing sufficient market share. In particular, Judge Katz noted the testimony by ProMedica's CEO Randy Oostra that building even a small hospital the size of Bay Park (much smaller than St. Luke's) would be a "several year project." Judge Katz Decision at *31. He also noted that Mr. Oostra "testified that it would cost $350 million or more . . . to build a hospital with 300 licensed beds similar to St. Luke's." Judge Katz Decision at *32.

180.    Judge Katz also concluded that the same risks would exist in building a new obstetrics unit. Judge Katz Decision at *33. Additionally, he conclude that the fact that obstetrics units do not typically generate revenues exceeding their cost would make it undesirable to expand or build a new obstetrics unit. Judge Katz Decision at *33.

181.    The same issues would prevent timely and sufficient entry into the relevant outpatient services markets. The expense involved in building an ambulatory surgery center is considerable. That is why there are very few ambulatory surgery centers in Lucas County except those owned in whole or in part by hospitals. Additionally, it would be very difficult for a non-hospital ambulatory surgery facility to succeed in attracting patients, since many patients and their physicians prefer utilizing facilities associated with hospitals. The same is true of imaging services and emergency services as described above. There are no freestanding emergency departments in Lucas County except those owned by hospitals.

182.    While WellCare's physicians are not in one of the relevant markets, ProMedica's actions, including the notice of termination by Paramount, addressed WellCare's contracts with Paramount as well. Those actions were an essential part of ProMedica's scheme to harm and suppress competition from St. Luke's, since WellCare's financial results affect St. Luke's bottom line, and since St. Luke's substantially depends on referrals by WellCare physicians. ProMedica's actions with regard to WellCare were therefore inextricably intertwined with ProMedica's anticompetitive scheme to suppress St. Luke's competition in the relevant markets. Similarly, Paramount's notice of termination with regard to its Medicare Advantage contract with St. Luke's were an essential part of ProMedica's scheme to harm and suppress overall competition from St. Luke's, and were therefore inextricably intertwined with ProMedica's anticompetitive scheme to suppress St. Luke's competition in the relevant markets involving services to commercially insured patients.

## COUNT I

## VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT

183.    Plaintiffs restate and reallege the allegations of all of the foregoing paragraphs, as if fully restated herein.

184.    The change in control provision in the divestiture agreement is anticompetitive and an illegal restraint of trade in violation of Section 1 of the Sherman Act. The provision conditions continuation of the Paramount-St. Luke's contracts on St. Luke's foregoing an affiliation with another entity which would revitalize it and enhance its competitiveness. Enforcement of the change in control clause threatens to cause substantial anticompetitive effects in the relevant markets, as described above. These are all markets in which ProMedica possesses market power.

185.    As a direct and proximate result of ProMedica's and Paramount's violations of Section 1 of the Sherman Act, significant injury to Plaintiffs' business and property is threatened if not enjoined.

186.    The actions of ProMedica, directly and through Paramount, have substantially harmed competition, and, if not enjoined, threaten to further harm competition in the relevant markets.

187.    Additionally, for these reasons, the change in control provision is void. As a result, Paramount's notice of termination of St. Luke's and WellCare are void as a breach of contract, since the notice of termination was not otherwise permitted by the contract between Paramount and St. Luke's.

## COUNT II

## VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT – MONOPOLIZATION

188.    Plaintiffs restate and reallege the allegations of all of the foregoing paragraphs, as if fully restated herein.

189.    ProMedica possesses and has possessed monopoly power in the relevant markets. ProMedica's actions described above, directly and through Paramount, and other subsidiaries are being undertaken in order to maintain and enhance ProMedica's monopoly power, and, if not

60

enjoined, threaten to achieve that result. These actions are exclusionary, and constitute unlawful monopolization of each of the relevant markets in violation of Section 2 of the Sherman Act. 15 U.S.C. § 2.

190.    As a direct and proximate result of ProMedica's violations of Section 2 of the Sherman Act, Plaintiffs have suffered injury to their business and property, and further such injury is threatened if ProMedica's and Paramount's actions are not enjoined.

191.    The actions of ProMedica and Paramount have substantially harmed competition, and, if not enjoined, threaten to further harm competition in the relevant markets.

## COUNT III

## VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT – ATTEMPT TO MONOPOLIZE

192.    Plaintiffs restate and reallege the allegations of paragraphs 1 through 187, as if fully restated herein.

193.    By each of its actions described above, ProMedica specifically intends to attain monopoly power in the relevant markets. Based on ProMedica's high market share, the high barriers to entry described above, and ProMedica's anticompetitive actions, there is a dangerous probability that ProMedica will achieve its goals and attain monopoly power, in any of the relevant markets in which it did not already possess monopoly power. Such actions constitute unlawful attempted monopolization of each of the relevant markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

194.    As a direct and proximate result of these violations of Section 2 of the Sherman Act, Plaintiffs have suffered injury to their business and property, and further such injury is threatened if ProMedica's and Paramount's actions are not enjoined.

36652014.25

195.    The actions of ProMedica and Paramount have substantially harmed competition, and, if not enjoined, threaten to further harm competition in the relevant markets.

**COUNT IV**

**VIOLATION OF VALENTINE ACT**

196.    Plaintiffs restate and reallege the allegations of all of the foregoing paragraphs, as if fully restated herein.

197.    The "change in control" provision of the divestiture agreement between ProMedica and St. Luke's is a violation of the Valentine Act, Ohio Revised Code, § 1331.04.

198.    As a direct and proximate result of these violations of the Valentine Act, Plaintiffs have suffered injury to their business and property, and further such injury is threatened if ProMedica's and Paramount's actions are not enjoined.

199.    The actions of ProMedica and Paramount have substantially harmed competition, and, if not enjoined, threaten to further harm competition in the relevant markets.

200.    Additionally, pursuant to § 1331.06 of the Valentine Act, the change in control provision is void. As a result, Paramount's notices of termination of St. Luke's and WellCare are void as a breach of contract, since the notice of termination was not otherwise permitted by the contracts between Paramount and St. Luke's.

**COUNT V**

**COMMON LAW UNFAIR COMPETITION**

201.    Plaintiffs restate and reallege the allegations of all of the foregoing paragraphs, as if fully restated herein.

202.    ProMedica's and Paramount's actions directed at Plaintiffs described above were not undertaken for any legitimate business reason, but were performed for the purpose of injuring Plaintiffs. Therefore, these actions constitute unfair competition under the Ohio common law.

62

36652014.25

203.    Plaintiffs have thereby suffered injury to their business and property, and further such injury is threatened if ProMedica's actions are not enjoined.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs prays that this Court grant the following relief:

i.      Preliminarily and permanently enjoin the termination of the contracts between St. Luke's Hospital and WellCare by Defendants and their affiliates, or any other actions to interfere with St. Luke's provision of covered services to Paramount insured members and its full compensation for such services;

ii.     Declare that the attempted termination of such contracts with St. Luke's and WellCare is void;

iii.    Award St. Luke's three times its damages suffered, as well as reasonable attorneys' fees; and

iv.     Award such other relief as this Court finds just.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

**s/ *Denise M. Hasbrook***

Denise M. Hasbrook (0004798)
dhasbrook@ralaw.com
Roetzel & Andress
One SeaGate, Suite 1700
Toledo, OH 43604
Telephone: (419) 242-7985
Fax: (419) 242-0316

*Attorney for Plaintiffs*

36652014.25